Filed 7/8/25

## CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KEVIN GRAY,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF STANISLAUS COUNTY,<br><br>Respondent;<br><br>THE PEOPLE et al.,<br><br>Real Parties in Interest. | F088505<br><br>(Super. Ct. No. 1044632)<br><br>**OPINION** |

ORIGINAL PROCEEDINGS; Petition for Writ of Mandate. Carrie M. Stephens, Judge.

Law Office of Martin Baker and Martin Baker for Petitioner.

No appearance for Respondent.

Rob Bonta, Attorney General, Cheryl L. Feiner, Gregory D. Brown, Jessica C. Butterick, and Nicolas P. Rossenblum, Deputy Attorneys General, for Real Party in Interest State Department of State Hospitals.

Jeff M. Laugero, District Attorney, Samuel Luzadas, Chief Deputy District Attorney, and Victoria A. Vasquez, Deputy District Attorney, for Real Party in Interest the People.

-ooOoo-

## <u>INTRODUCTION</u>

Petitioner Kevin Gray is a sexually violent predator (SVP) (Welf. & Inst. Code,[1] § 6600 et seq.) who was found suitable for conditional release (§ 6608, subds. (g)–(i)). After a prolonged housing search, real party in interest State Department of State Hospitals (the Department) and its designated program entity identified a proposed placement for Gray's conditional release. However, real party in interest, the People, through the Stanislaus County District Attorney, opposed the proposed placement site due to its proximity to the home of a child engaged in a public charter school's independent study program. The court determined that the child's home constituted a "school" within the meaning of section 6608.5, subdivision (f)[2] due to the child's home-based instruction, and the location therefore was statutorily ineligible for Gray's placement.

Gray filed this petition seeking a writ of mandate commanding the respondent court to vacate its order holding that Gray's placement at the proposed site was barred by section 6608.5, subdivision (f). He contends the court erred because the home-based independent study at issue here does not render the home a "public or private school" within the meaning of section 6608.5, subdivision (f). We issued an order to show cause why the relief requested should not be granted.[3] In their return, the Department agrees with Gray that the court erred in concluding the child's home is a school within the

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Section 6608.5, subdivision (f) prohibits conditional release of SVP's to a placement "within one-quarter mile of any public or private school providing instruction in kindergarten or any of grades 1 to 12, inclusive," when certain conditions exist. The parties do not dispute that Gray is subject to the placement restriction.

[3] This court initially denied the petition for writ of mandate. However, our Supreme Court granted petitions for review brought by Gray and the Department and transferred the matter to us with directions to vacate the order denying the writ of mandate and issue an order to show cause.

meaning of section 6608.5, subdivision (f). Meanwhile, the People maintain that the home constitutes a "home school" and the proposed placement therefore would violate section 6608.5, subdivision (f). The People also argue the court's ruling is supportable on alternative grounds relating to the proximity of children fitting within Gray's victim profile. (§ 6608.5, subd. (e)(2).)

We conclude the home at issue in this case is not a "school" within the meaning of section 6608.5, subdivision (f). We decline to consider the People's alternative arguments against the placement because these arguments were not considered by the trial court. Accordingly, we grant the petition for writ of mandate and direct the trial court to vacate its order.

## **BACKGROUND**

Gray was admitted to the custody of the Department in 2002 as a sexually violent predator. (§ 6604.) In October 2020, the trial court determined he was suitable for conditional release from commitment and ordered him placed with a forensic conditional release program (§ 6608, subds. (g)–(i)). The designated program entity was ordered to conduct a housing search in Stanislaus County.

In November 2021, the court found exceptional circumstances and ordered the housing search to extend to Merced and San Joaquin Counties. In November 2022, the court expanded the housing search to include Tuolumne, Alameda, Sacramento, Placer, and Madera Counties. The designated program entity conducted an extensive, multi-year search to locate a suitable placement for Gray.

On March 25, 2024, the court authorized the program entity to place a financial hold on a proposed placement site located in Stanislaus County.

On June 26, 2024, the People filed an opposition to the proposed placement site. The People argued the proposed placement site was statutorily ineligible pursuant to section 6608.5, subdivision (f) because a neighbor who lived 344 feet from the proposed site "runs a homeschool, properly registered with the Keyes School District [citation], in which she teaches her youngest daughter (age 4)." The People also argued the proposed placement site was inappropriate because (1) numerous children who fit Gray's victim profile lived within a one-mile radius of the property, (2) Gray had been diagnosed with an alcohol use disorder that fueled his criminal behavior and a bar was located in close proximity to the proposed property, and (3) another SVP was being considered for placement in a separate unit at the same property, which posed an unacceptable risk and would violate the terms and conditions of Gray's release if the two were to have contact with one another.

The matter was heard on July 22, 2024.[4] Erica F.[5] testified that she resides next door to the proposed placement site with her husband, parents, and three children, aged 10, six, and four. Her residence is approximately 50 to 100 feet away from the proposed placement residence and separated from it by a barbed wire fence. Erica testified that she enrolled her youngest child in Keyes to Learning Charter School (Keyes to Learning) in June 2024, where she would start transitional kindergarten in August 2024.[6] The charter school was based in the City of Keyes, approximately five miles away from Erica's

---

[4] At some point, the People also moved to revoke Gray's conditional release, and the motion was heard the same day as the People's opposition to the proposed placement site. The court denied the motion to revoke conditional release and no party sought review of that ruling. We therefore do not summarize the testimony presented in relation to the motion to revoke conditional release.

[5] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

[6] "Transitional kindergarten" means "the first year of a two-year kindergarten program that uses a modified kindergarten curriculum that is age and developmentally appropriate." (Ed. Code, § 48000, subd. (d).)

residence. However, Erica's child would attend school at home and do most of her schoolwork from home. Erica would provide her child's instruction using a curriculum and instructional materials sent home by the charter school. The charter school also would observe the child at its school site once weekly and would conduct assessments.

J. McGinnis, the principal and director of Keyes to Learning also testified at the hearing. She explained that the school is within the Keyes Union School District. The school has been in existence since 1995 and serves approximately 350 children. She described the school as an "independent study school," with programs that have a home school component. Some of their programs are "hybrid," with students attending school a few days each week while also engaging in schooling at home under parental supervision. However, the transitional kindergarten program "is completely independent study, meaning that our families come in once a week, get their curriculum[, a]nd then actually do the schooling at home."

In all the Keyes to Learning programs, parents are the child's primary educator. However, the curriculum and supplies are provided by the school, and learning is supervised by a credentialed teacher who meets with students once each week. The credentialed teacher is located in the school building. The school "keep[s] close tabs on [their] families to make sure the schoolwork is getting done." Additionally, students must take state tests and "do all the things the [S]tate of California" requires of public school students.

Because children enrolled at Keyes to Learning are enrolled in a public charter school, their parents are not required to file a private school affidavit to home school their children, as is sometimes required by Education Code section 33190.[7] McGinnis

---

[7] Education Code section 33190 requires "[e]very person, firm, association, partnership, or corporation offering or conducting private school instruction on the elementary or high school level" to annually "file with the Superintendent of Public

confirmed that parents of children enrolled in her school are "not operating their own home school at their residence," although "[a]ll the schooling is done in their home."

The court determined that the term "school," as used in section 6608.5, subdivision (f) should be interpreted broadly to include the type of independent study program being provided through Keyes to Learning. The court found this program to be analogous to the "autonomous home school" program at issue in *People v. Superior Court (Cheek)* 87 Cal.App.5th 373 (*Cheek*), which we discuss at length below. As such, the court determined the placement was not appropriate because "the Keyes to Learning model is a public home school" providing instruction within one-quarter mile of the proposed placement.

## DISCUSSION

The issue in this case is whether a home constitutes a "school" for purposes of section 6608.5, subdivision (f), if a child uses the home to engage in a public school independent study program. For reasons we explain, we conclude it does not.

## I.     Standard of Review

The question before us presents an issue of statutory interpretation. "The proper interpretation of a statute is a question of law we review de novo. [Citations.] ' " ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning." ' " ' " (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) "If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." (*People v. Snook* (1997) 16 Cal.4th 1210, 1215.) " ' " ' " 'If the statutory language permits more than one reasonable interpretation, courts may consider other aids,

<hr>

Instruction an affidavit or statement, under penalty of perjury, by the owner or other head" setting forth certain information for the current year.

6.

such as the statute's purpose, legislative history, and public policy.' " ' " ' [Citation.] ' "Generally, we consult extrinsic sources, like a statute's history, to interpret a statute only when its language is ambiguous." ' " (*People v. Walker* (2024) 16 Cal.5th 1024, 1032.)

## II. Applicable Law Regarding Conditional Release of SVP's

"The [Sexually Violent Predator Act] allows for involuntary commitment of certain convicted sex offenders. A person convicted of a sexually violent offense is subject to involuntary commitment after release from prison if a diagnosed mental disorder makes it likely the person will continue to engage in sexually violent criminal behavior. (§ 6600, subd. (a)(1).) The law's primary purpose is to protect the public; its secondary objective is to provide treatment for the offender's mental health disorder. (*People v. Peyton* (2022) 81 Cal.App.5th 784, 791–792.)" (*Cheek*, *supra*, 87 Cal.App.5th at p. 376 (maj. opn. of Grover, J.).)

Following commitment, an SVP's mental condition must be examined annually. (§ 6604.9, subd. (a).) The examiner must report on whether the person currently meets the definition of an SVP, and whether conditional release or unconditional discharge "is in the best interest of the person and conditions can be imposed that would adequately protect the community." (§ 6604.9, subd. (b).) "If [the Department] determines that either: (1) the person's condition has so changed that the person no longer meets the definition of [an SVP] and should, therefore, be considered for unconditional discharge, or (2) conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community, the director shall authorize the person to petition the court for conditional release to a less restrictive alternative or for an unconditional discharge." (§ 6604.9, subd. (d).)

7.

If the court determines a person is no longer an SVP, he or she must be released. (§ 6605, subd. (c).) "Alternatively, if an offender remains [an SVP] but can be treated in a less restrictive setting—and the public can be adequately protected by conditions allowing for close supervision—the offender can be conditionally released to the community under the supervision of [the Department]." (*Cheek*, *supra*, 87 Cal.App.5th at p. 376 (maj. opn. of Grover, J.); accord, §§ 6608, subd. (k), 6608.7.)

SVP's granted conditional release are subject to certain placement restrictions. (§ 6608.5.) In recommending a specific placement for conditional release, the Department must consider "[t]he age and profile of the victim or victims in the sexually violent offenses committed by the person subject to placement." (§ 6608.5, subd. (e)(2).) Additionally, as relevant here, SVP's previously convicted of certain offenses or having a history of improper sexual conduct with children cannot be placed "within one-quarter mile of any public or private school providing instruction in kindergarten or any of grades 1 to 12." (§ 6608.5, subd. (f).)

In *Cheek*, a divided panel of the Sixth District Court of Appeal held that the placement restriction contained in section 6608.5, subdivision (f) applied to a private school operating in a home. (*Cheek*, *supra*, 87 Cal.App.5th at pp. 375–376 (maj. opn. of Grover, J.).) The school at issue had filed a private school affidavit in conformance with Education Code section 33190, as required to establish itself as a private school. (*Cheek*, at p. 377.) Instruction was provided by two teachers, who were parents of students. Ten full- and part-time students were enrolled in the school, and the school had three applicants for future enrollment. (*Ibid.*)

The issue identified in *Cheek* was *not* whether the private school qualified as a school, a point which the majority presumed, but rather whether the placement restriction contained in section 6608.5, subdivision (f) was limited to more " 'traditional,' " non-home-based schools. (*Cheek*, *supra*, 87 Cal.App.5th at p. 380 (maj. opn. of Grover, J.).) The majority first determined that the statutory text did not reflect a legislative intent to

"exclude schools located in a home from the placement restriction" because "the Legislature used broad language to define what kinds of schools trigger the restriction." (*Ibid.*) Specifically, "[t]he only requirement in the statute is that the school provide instruction in kindergarten or grades one to 12." (*Id.* at pp. 380–381.) To "exclude from the statute private schools operating from a home would require [the court] to add a material term not found in the text." (*Id.* at p. 381.)

The court also rejected several reasons proffered by the parties as to why home-based private schools should be excluded from the placement restriction. First, the court rejected the argument that the Legislature understood "home schools to be in a separate category, distinct from public and private schools." (*Cheek*, *supra*, 87 Cal.App.5th at p. 381 (maj. opn. of Grover, J.).) In this regard, the court noted prior precedent had established that the Legislature, through the Education Code, "intended that home schools qualify as private schools for purposes of the state compulsory education law." (*Cheek*, at p. 381, citing *Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1084 (*Jonathan L.*).) The court was not persuaded that "the Legislature intended the term 'school' to include home schools in the context of compulsory education but had a different, and unexpressed, intention in the context" of the Sexually Violent Predator Act. (*Cheek*, at p. 381.) The court also concluded its analysis was unaffected by the small number of children enrolled in the private home school, inasmuch as the statutory text did not limit the school proximity restriction to schools "with some minimum number of students." (*Ibid.*)

Meanwhile, the dissent opined it was "inconsistent with both the plain language of the statute and the Legislature's balancing of competing interests" to hold that the definition of " 'any public or private school' " encompassed "any private home in which the residents elect to homeschool their children." (*Cheek*, *supra*, 87 Cal.App.5th at p. 383 (dis. opn. of Lie, J.).) Rather, the dissent would have held that the "ordinary or traditional meaning of a private school excludes a private home." (*Ibid.*) The dissent

9.

also found unpersuasive the majority's reliance on *Jonathan L.*, *supra*, 165 Cal.App.4th 1074, which interpreted the compulsory education law and did not purport to define the term "school" for all purposes.  (*Cheek*, *supra*, at pp. 384–385 (dis. opn. of Lie, J.).)  Indeed, the dissent noted that the Legislature has defined "school" in various ways in different contexts.  (*Id*. at p. 385.)  Furthermore, the dissent noted that the purpose of the placement restriction was not to avoid housing sex offenders "in proximity to where children live," a factor which remains available for discretionary consideration, but rather was driven by "the 'ambulatory practices of young children going to and coming from school' unsupervised."  (*Id*. at p. 386.)

## III.    Analysis

Gray and the Department argue that a home-based independent study program does not render the home a "school" for purposes of the section 6608.5, subdivision (f) placement restriction.  The People argue the home-based independent study program at issue here is analogous to that in *Cheek*, and the home therefore constitutes a school for purposes of the placement restriction.

In the first part of our analysis, we explain the differences between the private home school at issue in *Cheek* and the public school independent study program at issue in this case to explain why *Cheek* does not resolve the issue before us.  We then apply ordinary principles of statutory interpretation to conclude that the location where independent study takes place is not a "school" for purposes of the section 6608.5, subdivision (f) placement restriction.

### A.    *Cheek* is distinguishable

California's compulsory education law requires most children between the ages of six and 18 years of age to attend fulltime public day school.  (Ed. Code, § 48200.)  However, children attending a fulltime private day school that has complied with the annual affidavit filing requirements of Education Code section 33190 are exempted from

compulsory public education.[8]  (Ed. Code, § 48222.)  It is well settled that a home school that meets the filing requirements of Education Code section 33190 may be considered a private school for purposes of the compulsory public education law exemption, even where the school is operated by parents teaching only their own children.  (*Jonathan L.*, *supra*, 165 Cal.App.4th at pp. 1096–1097, 1099–1100.)  Accordingly, the school at issue in *Cheek* – a private school operating in a home – was indisputably considered a school for purposes of the Education Code.  In the *Cheek* majority's view, the only question before the court was whether the Legislature intended to exclude an otherwise legally recognized private school from the section 6608.5, subdivision (f) placement restriction. (*Cheeks*, *supra*, 87 Cal.App.5th at pp. 380–381 (maj. opn. of Grover, J.).)

Here, there is no question that the child residing at the residence adjacent to the proposed placement site is enrolled in an institution legally recognized as a school by the Education Code.  However, that school is a public charter school located approximately five miles from the proposed placement and therefore does not implicate the placement restriction.  Moreover, as we explain, the independent course of study the child participates in is considered a program, rather than a separate school.  We review the applicable law regarding both charter schools and independent study programs to explain how public school independent study is distinguishable from the private school at issue in *Cheek*.

A public charter school, such as the one at issue here, is a form of public school that operates independently from an existing school district structure to accomplish a variety of legislatively sanctioned purposes, including "[p]rovid[ing] parents and pupils with expanded choices in the types of educational opportunities that are available within

---

[8] Also exempted from compulsory public education are mentally gifted children attending certain private fulltime day schools (Ed. Code, § 48223), and children being instructed by a tutor with a valid teaching credential for a minimum number of hours per week (Ed. Code, § 48224).

11.

the public school system." (Ed. Code, § 47601, subd. (e).) An entity that wishes to establish a charter school must submit a petition that identifies "a single charter school that will operate within the geographic boundaries of that school district." (Ed. Code, § 47605, subd. (a)(1).) The petition must identify each site location at which the school proposes to operate. (*Ibid.*) Extending operations to additional sites constitutes a material revision to the school's charter that must be approved by the chartering authority following an open, public meeting. (*Id.*, subd. (a)(4).) The charter school must also notify the chartering authority of "the name and physical location of any resource center, meeting space, or other satellite facility operated by that charter school." (Ed. Code, § 47605.1, subd. (c)(3).)

Independent study, such as that offered by Keyes to Learning, is "an alternative to classroom instruction." (Cal. Code Regs., tit. 5, § 11700, subd. (c).) Public school districts and public charter schools may offer their students an independent study program to meet a variety of educational needs, including individualized study in a particular area of interest, continuing special study during travel, or individualized study for health-related reasons. (Ed. Code, §§ 51745, subd. (a), 51745.5, subd. (b), 51749.5, subd. (a).) Independent study may be offered as a short-term program for only a few days (see Ed. Code, § 51747, subd. (g)(9)(A)(ii)), or as a long-term program for the entire school year (*id.*, subd. (g)(5)). Independent study options may include both "hybrid . . . and nonclassroom-based programs." (Ed. Code, § 51744, subd. (a).)

Schools must maintain a written independent study agreement for all pupils engaged in an independent study program. (Ed. Code, § 51747, subd. (g).) The written agreement must contain information including the duration of the agreement, schoolwork to be completed during the period covered by the agreement, resources available to the student, and information regarding the school employee responsible for supervision of independent study. (*Id.*, subd. (g)(1)–(9).) Notably, the location where independent study is to occur is *not* a matter required to be included in the independent study agreement.

Indeed, the only restriction on location relates to school funding – a school may not claim an independent study student for purposes of average daily attendance if the student is not a resident of the county or an adjacent county. (Ed. Code, § 51747.3, subd. (c).) Nothing in the Education Code limits the locations at which a student may choose to engage in independent study, nor does the code require a student to disclose to the school or district the location where he or she proposes to complete their instruction.

Within the Education Code, independent study is one of many instructional programs or courses of instruction offered by public schools. It is included in the same part of the Education Code that describes such wide-ranging topics as required courses, homework policies, bilingual education, gifted and talented programs, and language arts enrichment. (Ed. Code, tit. 2, div. 4, pt. 28 ["General Instructional Programs"].) More specifically, it is included in the chapter describing "Authorized Classes and Courses of Instruction," which includes math and reading programs, instruction by correspondence, evening school, work experience, bicycle safety, and driver training. (Ed. Code, tit. 2, div. 4, pt. 28, ch. 5.)

The foregoing makes clear that, for purposes of the Education Code, independent study is a "program," not a type of "school." (See Ed. Code, § 51744, subd. (b).) Indeed, nothing in the Education Code suggests that the location where independent study occurs – which is entirely at the discretion of the student and may change at any time based on that student's needs or preferences – constitutes a school.[9] Thus, unlike in *Cheek*, we are not faced with the question of whether an otherwise legally recognized school should be excluded from the section 6608.5, subdivision (f) placement restriction. Rather, we are faced with the question of whether a location should be considered a school for purposes

---

[9] Furthermore, for independent study programs offered by charter schools, construing the independent study location to constitute a school would implicate the detailed reporting requirements regarding the facilities at which the charter school intends to operate. (Ed. Code, §§ 47605, subd. (a)(4), 47605.1, subd. (c)(3).)

of section 6608.5, subdivision (f), *even if* it is not considered a school for purposes of the Education Code. *Cheek* does not resolve this question.

**B. An independent study location is not a "school" within the meaning of section 6608.5, subdivision (f)**

Section 6608.5, subdivision (f) prohibits certain SVP placements "within one-quarter mile of any public or private school providing instruction in kindergarten or any of grades 1 to 12," but does not define the term "school."[10]

" 'When a term goes undefined in a statute, we give the term its ordinary meaning.' " (*De Vries v. Regents of University of California* (2016) 6 Cal.App.5th 574, 590–591.) Black's Law Dictionary defines a "school" (boldface omitted), in relevant part, as "[a]n institution of learning and education," "[t]he collective body of students under instruction in an institution of learning," or "a building or hall where instruction is given; a schoolhouse or similar educational institution." (Black's Law Dictionary (12th ed. 2024) p. 1617.) It further defines a "public school" (boldface omitted) as "[a]n elementary, middle, or high school established under state law, regulated by the local state authorities in the various political subdivisions, funded and maintained by public taxation, and open and free to all children of the particular district where the school is located." (*Ibid.*) "[I]n common parlance, 'a school' refers to an established destination where students congregate for instruction." (*Cheek*, *supra*, 87 Cal.App.5th at p. 383 (dis. opn. of Lie, J.).) These definitions do not suggest that every location where learning may take place constitutes a school. Rather, the ordinary meaning of the term "school," and particularly of the term "public school," is a location where children congregate for

---

[10] We agree with the dissenting opinion in *Cheek* that the reference to "instruction in kindergarten or any of grades 1 to 12" serves as a limitation on the types of schools that trigger the placement restriction, but "does not function in the statute as a definition of 'any public or private school.' " (*Cheek*, *supra*, 87 Cal.App.5th at p. 384 (dis. opn. of Lie, J.).)

14.

instruction. A home where a child engages in independent study does not fit within this definition.[11]

Nor does the legislative purpose behind the placement restriction indicate the Legislature intended it to extend to locations where independent study takes place. Courts have noted that the obvious purpose of the placement restriction is to "create ' "predator free zones around schools . . . to prevent sex offenders from living near where our children learn and play," ' " and to " 'reduce the amount of incidental contact child sex offenders have with the children attending [a] school.' " (*People v. Christman* (2014) 229 Cal.App.4th 810, 816.) The restriction has been held to take into consideration the "ambulatory practices" of children walking to and from school. (*Id.* at p. 818.) Notably, the Legislature did not choose to categorically bar conditionally released SVP's from being placed near homes, parks, or other locations where " ' "children learn and play." ' " (*Id.* at p. 816.) The Legislature's particular focus on schools suggests it was concerned with the dangers posed by SVP's to children in and around the congregate, institutional setting of a traditional public school, rather than any dangers posed to children engaged in independent learning at home.

We also are mindful that we are "obligated to 'adopt a common sense construction [of the statute] over one leading to mischief or absurdity.' " (*In re Greg F.* (2012) 55 Cal.4th 393, 410.) In this regard, we note that the details of public school independent study programs may vary widely. As stated, such programs may be "hybrid" or entirely "nonclassroom-based." They may last for mere days or an entire school year. They may be completed at home, in a hotel room, on an airplane, at a museum, at the beach, or any combination of locations the child and family choose. It would be absurd to consider most of these locations a "school" simply because a student has chosen to study there for

---

[11] Because the child in this case is enrolled in a public school, we do not consider the definition of a private school.

15.

even a brief period of time. Nor do we believe the Legislature intended to eschew the ordinary definition of a school to require courts to determine, on a case-by-case basis, whether any of these independent study scenarios are sufficiently school-like to warrant invocation of the placement restriction. Instead, the Legislature used ordinary terms – "any public or private school" – in setting the placement restriction, and we assume the Legislature meant what it said. (*People v. Snook*, *supra*, 16 Cal.4th at p. 1215.)

Based on the foregoing, we conclude that, for purposes of section 6608.5, subdivision (f), the phrase "any public or private school" does not include a home where a child engages in a public school independent study program.[12] The court erred in holding otherwise.

### C.     The People's Alternative Arguments

Finally, the People argue denial of the proposed placement was proper on alternative grounds: the proximity of children who fit Gray's victim profile. Pursuant to section 6608.5, subdivision (e)(2), the proximity of persons meeting an offender's victim profile is a proper consideration in determining the suitability of a proposed placement. Although the People raised this argument against the placement in the trial court, the trial court did not consider it, nor did it make factual findings on this point. We therefore decline to consider this argument in the first instance. The People may raise any alternative arguments regarding the proposed placement in the trial court.

---

[12] Gray and the Department point out that interpreting the placement restriction to apply to homes where students engage in independent study would make it difficult, if not impossible to place SVP's on conditional release, potentially jeopardizing the constitutionality of the Sexually Violent Predator Act commitment scheme. However, because we conclude such homes do not constitute schools, we need not assess the difficult, practical realities of a contrary conclusion.

## DISPOSITION

Let a peremptory writ of mandate issue, directing the superior court to vacate its order dated July 22, 2024, holding that Gray's placement at the proposed site is barred by section 6608.5, subdivision (f).  The order to show cause is discharged.


                                             DETJEN, Acting P. J.

WE CONCUR:


FRANSON, J.


MEEHAN, J.